Reversed and Rendered and Memorandum Opinion filed January 26, 2006









Reversed and Rendered and Memorandum Opinion filed January 26,
2006.

 

 

In The

 

Fourteenth Court of Appeals

_______________

 

NO. 14-04-00120-CV

_______________

 

TIDWELL PROPERTIES, INC. 

A/K/A VELDEKENS PROPERTIES, Appellant

 

V.

 

AMERICAN FIRST NATIONAL BANK,
Appellee

__________________________________________________________

 

On Appeal from the 152nd District Court

Harris County, Texas

Trial Court Cause No. 00‑01244

__________________________________________________________

 

M E M O R A N D U M   O
P I N I O N

Appellant, Tidwell Properties, Inc. a/k/a Veldekens
Properties (AVP@), appeals a judgment in favor of
appellee, American First National Bank (Athe Bank@), in the Bank=s breach of contract suit.  In two issues, VP contends the evidence is
legally and factually insufficient to support the jury=s findings on breach of contract and
resulting damages.  Because we conclude
the evidence is legally insufficient to support the jury=s finding on damages, we reverse and
render a take nothing judgment.








I.  Background

At all relevant times, VP owned a shopping center in
Houston.  In 1997, VP leased 42,270
square feet of the shopping center to Ki Yeol Kwon, who operated a supermarket
in the space.  VP took a landlord=s security interest in the
supermarket=s equipment and inventory.  The Bank financed Kwon=s supermarket, so it also took a
security interest in the equipment and inventory.  In 1998, VP and the Bank entered into a ALandlord=s Subordination Agreement@ to address their competing liens on
this collateral.  They agreed that the
Bank=s lien was superior, VP would give
the Bank written notice if VP evicted Kwon, and the Bank would have fifteen
days to remove the collateral.  If the
Bank did not remove the collateral, its security interest would terminate and
VP=s lien would become superior.

In early October 1999, Kwon closed his store after business
declined.  He defaulted on his loan from
the Bank, and VP evicted him.  The Bank
decided to look for someone else to lease the space from VP and buy the
collateral from the BankCan arrangement that would benefit both VP and the Bank.

On October 8, 1999, Sherry Miles, the Bank=s president, and Charles Veldekens,
VP=s president, discussed the issues
resulting from Kwon=s default and eviction. 
At trial, Miles and Veldekens disagreed regarding their discussion.  According to Miles, she told Veldekens about
the Bank=s plan to find a new tenant for the
space; Veldekens responded that someone wanted to open a dollar store in the
space; Miles expressed concern that a lease to a dollar store would compromise
the Bank=s plan; thus, Veldekens agreed to
notify Miles in advance if he decided to sublease part of the space.  In contrast, Veldekens denied that he made
this agreement.  In any event, two months
before this discussion, VP had subleased 15,000 square feet to Eddie Punjwani,
who planned to operate a dollar store.[1]








On October 12, 1999, VP sent the Bank written notice of Kwon=s eviction, and, thus, activated the
Bank=s fifteen-day subordination period to
remove the collateral.  During the
subordination period, the Bank found a potential buyer/tenant, Jin Wu Kim.  The Bank represented to Kim that 42,270
square feet were available. 
Subsequently, the Bank and Kim discovered that VP had already leased
15,000 square feet to Punjwani, who was now operating his dollar store on the
premises.[2]  Nonetheless, negotiations between the Bank
and Kim continued.  On October 18, 1999,
Kim signed an AOffer to Purchase@ agreeing to buy the collateral from
the Bank for $220,000 and lease the remaining 27,240 square feet.[3]  The agreement was subject to Kim=s execution of a lease.

In early November 1999, the Bank paid VP $20,000; in return,
VP agreed to extend the Bank=s subordination period until the end of November, so the Bank
could consummate the agreement with Kim. VP also agreed to lease the remaining
27,240 square feet to Kim.  VP did offer
Kim a tentative lease agreement for the 27,240 square feet although
negotiations continued over the rental rate. 
However, in mid-November, Kim reneged on his agreement with the Bank.  As we will discuss, the parties disagree as
to the reasons Kim reneged on the agreement. 
At any rate, the Bank was unable to find another buyer/tenant before the
extended subordination period expired. 
The Bank elected not to remove most of the collateral although it sold
some of the groceries for $12,000.








The Bank sued VP for breach of contract, among other claims.[4]  According to the Bank, VP agreed to notify
the Bank if it decided to lease part of the space, and VP breached the
agreement when it was made by failing to notify the Bank that it had already
subleased part of the space to Punjwani. 
A jury found that VP breached the agreement, and the Bank incurred
$20,000 in damages as a result of the breach.[5]  The jury was instructed to consider the
following element of damages only: ANet sales proceeds from the
prospective sale of the collateral . . . from [the Bank] to [Kim] that were a
direct, probable and foreseeable consequence of [VP=s] failure to comply.@ 
The trial court entered judgment pursuant to the verdict and also
awarded the Bank $50,000 in attorney=s fees.

II. 
Legal Sufficiency of the Evidence on Damages

In its first issue, VP contends the evidence is legally and
factually insufficient to support the jury=s finding that the Bank incurred
$20,000 in damages as a result of VP=s breach of the agreement.

A.        Standard of
Review








When both legal and factual sufficiency challenges are raised
on appeal, we must first examine the legal sufficiency of the evidence.  See Manon v. Tejas Toyota, Inc., 162
S.W.3d 743, 752 (Tex. App.CHouston [14th Dist.] 2005, no pet.) (citing Glover v. Tex.
Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex. 1981)).  We will sustain a legal sufficiency or Ano-evidence@ challenge if the record shows one of
the following: (1) a complete absence of a vital fact, (2) rules of law or
evidence bar the court from giving weight to the only evidence offered to prove
a vital fact, (3) the evidence offered to prove a vital fact is no more than a
scintilla, or (4) the evidence establishes conclusively the opposite of the
vital fact.  City of Keller v. Wilson,
168 S.W.3d 802, 810 (Tex. 2005).  We
consider the evidence in the light most favorable to the verdict and indulge
every reasonable inference that supports it. 
Id. at 821B22.  The evidence is
legally sufficient if it would enable reasonable and fair-minded people to
reach the verdict under review.  Id.
at 827.  We credit favorable evidence if
reasonable jurors could, and disregard contrary evidence unless reasonable
jurors could not.  See id.  The trier of fact is the sole judge of the
witnesses= credibility and the weight to be
given their testimony.  See id. at
819.  We cannot substitute our judgment
for that of the jury, so long as the evidence falls within the zone of
reasonable disagreement.  See id.
at 822.  But, Aif the evidence allows of only one
inference, neither jurors nor the reviewing court may disregard it.@ 
Id.

B.        Discussion

In a breach of contract action, a plaintiff may recover
actual damages that are the natural, probable, and foreseeable consequence of
the defendant=s conduct.  Mead v. Johnson Group, Inc., 615
S.W.2d 685, 687 (Tex. 1981); Prudential Sec., Inc. v. Haugland, 973
S.W.2d 394, 397 (Tex. App.CEl Paso 1998, pet. denied); Winograd v. Clear Lake City
Water Auth., 811 S.W.2d 147, 156 (Tex. App.CHouston [1st Dist.] 1991, writ
denied).  The absence of this causal
connection between the alleged breach and the damages sought will preclude
recovery.  Prudential Sec., Inc.,
973 S.W.2d at 397; Nelson Cash Register, Inc. v. Data Terminal Sys., Inc.,
671 S.W.2d 594, 600 (Tex. App.CSan Antonio 1984, no writ). 

Here, VP argues that there is no evidence of a causal
connection between VP=s failure to notify the Bank that it had leased part of the
space to Punjwani and the Bank=s loss of the prospective sale of the collateral to Kim.  We agree. 
In fact, the evidence conclusively establishes no causal connection, and
reasonable jurors could not disregard this evidence.  See City of Keller, 168 S.W.3d
at 814B16, 827.[6]  In particular, the evidence demonstrates that
(1) even after Kim and the Bank learned VP had leased part of the space to
Punjwani, Kim agreed to buy the collateral and lease the remaining space; and
(2) Kim later reneged on that agreement for reasons unrelated to VP=s failure to notify.

1.         Kim=s Agreement to Buy the Collateral








The evidence demonstrates that even after Kim and the Bank
learned VP had leased part of the space to Punjwani, Kim agreed to buy the
collateral and lease the remaining space. Kim testified that when he learned
part of the space had been leased to the dollar store, he felt Anot good.@ 
He had originally planned to operate his grocery store in some of the
space and sublease the rest to various kiosks to help defray his lease payments.  Nevertheless, he testified that he was still
interested in buying the collateral and leasing the remaining space because it
was a good location.  Subsequently, Kim
did sign the agreement with the Bank reflecting that the space to be leased was
27,240 square feet.  At trial, Kim
confirmed that when he signed the agreement, he knew he was getting only 27,240
square feet, but he chose to accept the Adeal@ anyway.

Moreover, at trial, Sherry Miles, the Bank=s president, admitted several times
that Kim agreed to buy the collateral and lease the remaining space after
learning that VP had leased part of the space to Punjwani.  Miles testified that the sublease to Punjwani
Aalmost killed the contract, but
fortunately we were able to convince Mr. Kim that the 27,240 square feet would
be sufficient and we could still do what he wanted to in that space,@ and Ahe was willing to accept the lower
square footage.@  Later, Miles
reiterated that the lease to Punjwani Aalmost killed the deal@ because Kim was disappointed that he
would not have the entire 42,270 square feet, but Awe did salvage the deal,@ and Awe did sign the contract even with
the 20 some thousand square feet.@ 
Subsequently, Miles testified yet again that the lease to the dollar
store was not a Adeal breaker@ with Kim.

The presence of the dollar store created a few issues in
addition to the reduction in space.  Kim
wanted his grocery store and the dollar store to have separate air conditioning
systems and electric meters and wanted a wall to separate the stores.  However, Kim testified that VP agreed to
these requests, and after these issues were resolved, he still wanted to buy
the collateral from the Bank.  Miles also
acknowledged that the parties Agot past@ these issues. 
Consequently, the evidence conclusively establishes that Kim agreed to
buy the collateral despite VP=s earlier failure to notify the Bank that it had leased part
of the space to Punjwani.








2.         Kim=s Decision to Renege on the Agreement


The evidence further demonstrates that Kim later reneged on
his agreement to buy the collateral for reasons unrelated to VP=s earlier failure to notify.  Kim=s testimony is not exactly clear
because he gave two different reasons for reneging.  

At one point, Kim explained that shortly after he signed the
agreement, several members of the Veldekens family visited him at his existing
store.  They told him that the Bank=s subordination period would expire
soon and suggested he would get a better deal by waiting to do business
directly with them.  According to Kim,
until that time, he was unaware of the subordination agreement between VP and
the Bank, and, thus, did not know the Bank had limited time to sell the
collateral.  Kim also indicated that
until that time, he thought the Bank had the power to lease the space.[7]  Therefore, after the Veldekenses= visit, Kim realized he did not have
to buy the collateral from the Bank for $220,000 to obtain the lease for the
store.  At trial, Kim was asked, AAnd after learning that you didn=t actually need to pay $225,000 [sic]
for the material, you eventually decided not to go through with the deal?@ 
He responded, AThe Bank lost the powers. 
I don=t need to pay that much money.@

At another point, Kim suggested that the Areal problem@ was the rental rate because he would
pay twice the rent Kwon had paid. 
Regardless, Kim never testified that VP=s earlier failure to notify the Bank
that it had subleased part of the space played any role in his decision to
renege on his agreement with the Bank.








Nonetheless, the Bank contends that VP=s failure to notify caused Kim to
renege on the agreement because it made Kim suspicious of the Veldekenses.  Kim did testify that he was suspicious of the
Veldekenses.  However, his testimony
indicates that his suspicions arose after he reneged on his agreement
with the Bank.  In particular, Kim testified
that after the Bank=s subordination period expired, the Veldekenses did approach
him about a deal.[8]  He declined this deal because he was
suspicious of the Veldekenses.  However,
he never testified that he reneged on his agreement with the Bank because he
was suspicious of the Veldekenses. 

Further, although Kim=s testimony is somewhat difficult to
understand, it indicates his suspicions had nothing to do with VP=s earlier failure to notify.  Kim explained: 

Then that Mr. Veldekens I am sorry about what Mrs.
Veldekens and Mr. Veldekens tell me because my feel is I didn=t feel safe at that time.  I am suspicious.  If I am going to good operating at the best
over there five years after they might take over that business that=s because they kept offering me.  Okay, I have this space.  I have that property.  If after doing it, I can let you move on
better properties who think is going to be paying that expenses?@ 

 

Thus, Kim=s suspicions were apparently based on the possibility that VP
would terminate his lease at the end of a five-year rental period.  Kim did not provide any other reasons that he
was suspicious of the Veldekenses. 
Consequently, there is not any evidence that Kim=s suspicions arose from VP=s earlier failure to notify, much
less any evidence that Kim=s suspicions caused him to renege on his agreement with the
Bank.








Regardless, the Bank suggests that the jury, as judge of the
weight and credibility of the witnesses= testimony, was free to determine
that VP=s failure to notify generally Apoisoned@ the agreement and affected Kim=s decision to renege.  We disagree. 
Although the jury may draw inferences from the evidence, those
inferences must be reasonable and logical. See Hammerly Oaks, Inc. v.
Edwards, 958 S.W.2d 387, 392 (Tex. 1997); see also City of Keller,
168 S.W.3d at 822.  The jury could not
reasonably infer that VP=s failure to notify generally Apoisoned@ the agreement and affected Kim=s decision to renege considering
there is no evidence supporting such an inference, Kim was still willing to
make the agreement after learning of the failure to notify, and Kim later
reneged on the agreement for reasons unrelated to the failure to notify.

Finally, the Bank urges several alternative reasons to
support the causal connection between VP=s failure to notify and the Bank=s damages.  The Bank asserts that if it had known less
space was available, it might have adjusted its Arecovery plan@ early on, represented to potential
buyers that significantly less space was available, or liquidated the
collateral piecemeal.  However, when
assessing damages, the jury was not allowed to consider the loss of any
prospective sale of the collateral. 
Instead, the jury was instructed to consider one narrow element of
damages: the loss of the prospective sale of collateral to Kim. Therefore,
these alternative theories cannot support the jury=s finding.

In sum, there is no evidence that VP=s failure to notify the Bank that it
had subleased part of the space caused the Bank to lose the sale of collateral
to Kim.  Thus, the evidence is legally
insufficient to support the jury=s finding on damages.  Accordingly, we sustain VP=s first issue, reverse the judgment
of the trial court, and render judgment that the Bank take nothing.[9]

 

/s/        Paul C. Murphy

Senior Chief Justice

 

Judgment rendered
and Memorandum Opinion filed January 26, 2006.

Panel consists of
Justices Edelman, Guzman, and Murphy.[10]

 

 











[1]  According to
VP, it had subleased the 15,000 square feet to Punjwani before Kwon=s default and eviction to help Kwon improve his cash
flow by reducing his lease payments.





[2]  When the Bank
and Kim first visited the space, it was unoccupied, but during a subsequent
visit, they discovered that Punjwani had opened the dollar store.





[3]  Although
42,270 square feet minus 15,000 square feet would equal 27,270 square feet, the
AOffer to Purchase@
specified that Kim would lease 27,240 square feet.





[4]  The Bank also
sued for negligence, conversion, and tortious interference, but only the breach
of contract claim remained when the case was submitted to the jury.





[5]  The jury also
found that VP agreed to extend the subordination period until the end of
November 1999 and enter into a lease agreement with Kim, but the jury found
that VP did not breach that agreement. 
Therefore, that agreement is not at issue in this appeal.





[6]  In its second
issue, VP contends there is no evidence to support the jury=s finding that VP breached its agreement to
notify.  We will assume, without
deciding, that the evidence supports that finding because there is,
nonetheless, no evidence that the breach, if any, caused the Bank to lose the
sale of collateral to Kim.





[7]  Kim=s testimony regarding who he thought had the power to
lease the space was somewhat contradictory. 
On direct examination, he generally testified that he knew VP was the
landlord, but he did not specifically state when he gained that knowledge.  On cross-examination, he expressly testified
that when he agreed to buy the collateral from the Bank, he thought the Bank
had the power to lease the space.  In any
event, once the Veldekenses visited him, he knew that VPCnot the BankChad the
power to lease the space.  





[8]  Kim testified
that the Veldekenses approached him after the Alease period
was up.@  Because Kim
never entered into a lease with VP, he was apparently referring to the Bank=s subordination period.





[9]  Because the
evidence is legally insufficient to support the jury=s finding on damages, we need not consider VP=s second issue challenging the jury=s finding that VP breached the agreement to notify.





[10]  Senior Chief
Justice Paul C. Murphy sitting by assignment.